UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
CHRISTOPHER AND SUMINTRA DRYDEN

Plaintiffs,

-against-

THE CITY OF NEW YORK, POLICE OFFICER
MICHAEL ROBBERT (NYPD) SHEILD #6469,
SERGEANT NIKKI PRASAD (NYPD SUPERVISING
OFFICER), AND NYPD POLICE OFFICER JOHN
DOE (THE NAME JOHN DOE BEING FICTICIOUS,
AS THE TRUE NAME IS PRESENTLY UNKNOWN),

Defendants.

-------------------------------------------------------------------X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ FEB 2 2 2011 ★

BROOKLYN OFFICE

Docket No.:

**COMPLAINT**

**SUMMONS ISSUED**

**JURY TRIAL**
**DEMANDED**

**CV 11 - 0862**

**GARAUFIS, J.**
**MANN. M.J.**

The Plaintiffs, complaining by their attorney, JEFFREY CHABROWE, ESQ.,
respectfully show to this Court and allege:

## JURISDICTION

1.      Jurisdiction is founded upon the existence of a Federal Question.

2.      This is an action to redress the deprivation under color of statute, ordinance,
regulation, custom, or usage of rights, privileges, and immunities secured to the
Plaintiff by the Fourth and Fourteenth Amendments to the Constitution of the United
States pursuant to 42 U.S.C. Section 1983 and arising under the law and statutes of
the State of New York.

3.      Jurisdiction is founded upon 28 U.S.C. Sections 1331, 1343(3) and 1343(4), this
being an action authorized by law to redress the deprivation under the color of law,
statute, ordinance, regulation, custom and usage of rights, privileges and immunities
secured to Plaintiffs by the Fourth and Fourteenth Amendments to the Constitution of
the United States.

## VENUE

4.      Venue lies in this District pursuant to 28 U.S.C.A. Section 1391(b) (2) since the
events giving rise to the claim occurred in the Eastern District.

1

## PARTIES

5.    Plaintiffs CHRISTOPHER DRYDEN and his wife, SUMINTRA DRYDEN, are both residents of Brownsville, Brooklyn, in the City of New York.

6.    Upon information and belief, at all times hereinafter mentioned, the Defendant, CITY OF NEW YORK was and still is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York, and that at all times relevant all Defendant officers were acting for, upon, and in furtherance of the business of their employer and within the scope of their employment.

7.    Upon information and belief, at all times hereinafter mentioned, the Defendant, CITY OF NEW YORK, its agents, servants, and employees, operated, maintained and controlled the NEW YORK CITY POLICE DEPARTMENT, including all the police officers thereof.

8.    Upon information and belief, at all times hereinafter mentioned, Defendant POLICE OFFICER ROBBERT, POLICE OFFICER DOE, and SERGEANT PRASAD were employed by the Defendant, CITY OF NEW YORK, as members of its police department.

9.    Upon information and belief, at all times hereinafter mentioned, Defendant OFFICERS ROBBERT, DOE, and PRASAD worked out of the 73rd Precinct in the neighborhood of Brownsville, Brooklyn in the City of New York.

10.    The NEW YORK CITY POLICE DEPARTMENT is a local governmental agency, duly formed and operating under and by virtue of the Laws and Constitution of the State of New York and the POLICE CHIEF THE NEW YORK CITY POLICE DEPARTMENT is responsible for the policies, practices, and customs of the NEW YORK CITY POLICE DEPARTMENT as well as the hiring, screening, training, supervising, controlling and disciplining of its police officers and civilian employees, and is the final decision maker for that agency.

11.    This action arises under the United States Constitution, particularly under provisions of the Fourth and Fourteenth Amendments of the Constitution of the United States, and under federal law, particularly the Civil Rights Act, Title 42 of the United States Code, Section 1983, and the rights guaranteed by the Constitution and laws of the State of New York.

2

12.     Individual Defendants in this action are being sued in both their individual and official capacities.

## STATEMENT OF FACTS

13.     On April 18, 2010, at approximately 10:00PM, Plaintiffs Christopher and Sumintra Dryden heard a knock on the backdoor of their three-family house, which they share with their two children, Jahsani (age 8) and Jahmarli (age 3), as well as Sumintra Dryden's mother and sister, and which is located at 45 Chester Street, in the neighborhood of Brownsville, Brooklyn, New York.

14.     Christopher Dryden, who was 38 years old at the time, and his wife, who was 28 years old at the time, had no criminal or arrest records of any kind.

15.     When Mr. Dryden answered the door, he was met by Defendant Officers Robbert and Doe who stated that the volume of Mr. Dryden's stereo was too high and instructed him to lower it.

16.     Mr. Dryden, who was still standing in the doorway while the Defendant Officers remained outside, responded by apologizing and agreeing to comply with the Officers' request that he turn down his stereo.

17.     At that point, without explanation or justification, and without seeking or being granted a warrant or permission of any kind, Defendant Officers Robbert and Doe, pushed past Mr. Dryden, burst into the Drydens' home, and began opening drawers, rooting through cupboards, and otherwise commencing an unauthorized search.

18.     After about 10 minutes of fruitless rummaging, one of the Defendant Officers, in an apparent attempt to manufacture a pretextual justification for the illegal search, suddenly stated that he thought he might smell marijuana.

19.     Officers Robbert and Doe then resumed their unauthorized search, opening the Drummonds' closets, digging through underwear drawers, and leaving piles of towels, linens, and other personal items strewn about the floor.

20.     As the illegal search continued, Defendant Officers Robbert and Doe began taunting Mr. Dryden and his wife, stating in sum and substance, "We know you have weed. We know you have guns," and maliciously threatening to "take away [the Drydens'] kids" if or when they found the alleged contraband.

3

21.    Too terrified to speak, Mr. and Mrs. Dryden watched in horror as Defendant Officers Robbert and Doe continued to ransack their apartment.

22.    Finally, Mrs. Dryden's sister, who had wandered in from her apartment within the three-family home to see what the commotion was about, instructed Robbert and Doe to discontinue their search, as they had no legal basis for having commenced it.

23.    Robbert and/or Doe responded by yelling at Mrs. Dryden's sister in a malicious and threatening manner to, in sum and substance, "Shut up, get out, and mind [her] own business."

24.    Fearful that the Defendant Officers might shift their illicit attentions to her next, she complied with the Defendants' demands and returned to her apartment.

25.    Shortly thereafter, one of the Defendant Officers found a paper bag on top of the Drydens' refrigerator; upon opening it, the Defendant Officer found that the bag contained two small glassine bags of marijuana.

26.    Despite the fact that the Defendant Officers had no basis for believing the marijuana belonged to any particular resident of the three-family home, one of the Defendant Officers nevertheless proceeded to handcuff Mr. Dryden, and walk him out to the Drydens' garage, located several yards behind the main house, while the other Officer continued the search.

27.    Once in the garage, the Defendant Officer continued to mock, deride, and ridicule Mr. Dryden, demanding to know "what else" Mr. Dryden might be "hiding," and continuing to threaten him with the prospect of having his children stripped away from him.

28.    After approximately 10 minutes of inflicting this unrelenting abuse upon Mr. Dryden, the Defendant Officer returned him, still in handcuffs, to the main house.

29.    When Mrs. Dryden saw that her husband was in handcuffs, she burst into tears, terrified for her husband's safety, traumatized by the sight of seeing her husband being so horribly mistreated, and deeply concerned by the prospect that her children, who were asleep in their beds, might awaken and witness the same terrible sight.

30.    Of particular concern to Mrs. Dryden was protecting her son, Jahsani, who for much of his young life had voiced glowing appreciation for New York City police, as well as a desire to one day become a police officer himself.

31.     As the illegal search continued, one of the Defendant Officers found an old, unloaded, .22 caliber firearm packed in a protective case, buried in the back of one of the Drydens' lesser-used closets.

32.     Mr. Dryden would subsequently explain that he had long ago packed the weapon away for safekeeping and forgotten about it, having randomly discovered it in a delivery vehicle he had been sharing with a colleague, and wanting to eliminate the risk of ever being pulled over with such a thing near his person.

33.     Defendant Officers Robbert and Doe proceeded to search the Drydens' home for approximately10 more minutes, before formally placing Mr. Dryden under arrest about two hours after their illegal home invasion began.

34.     Once Mr. Dryden was delivered to the 73rd Precinct for processing, he was charged with Criminal Possession of a Weapon in the 4th Degree, Criminal Possession of Marijuana in the 5th Degree, and Unlawful Possession of Marijuana, despite the fact that the information which formed the basis for his arrest, detention, and subsequent prosecution was maliciously supplied by Defendant Officers Robbert and Doe with knowledge that it was false.

35.     In addition to helping manufacture a false justification for searching the Drydens' home, Defendant Officer Robbert went on to blatantly fabricate material aspects of his written report about the incident.

36.     More specifically, Robbert falsely stated that his initial encounter with Mr. Dryden involved witnessing him smoking a marijuana cigarette through the open backdoor of Mr. Dryden's home.

37.     Notably, Robbert made this claim, despite also characterizing Mr. Dryden's physical condition as "apparently normal," as opposed to being impaired in some way by marijuana.

38.     In addition, no effort was made by any of the defendants to substantiate Officer Robbert's written claim that he had witnessed Mr. Dryden smoking marijuana—there is no record, for example, of Mr. Dryden having been tested for drugs following his arrest, much less any record of Mr. Dryden having tested positive for marijuana—once again giving rise to an inference that Defendant Officer Robert deliberately and maliciously fabricated material aspects of his report.

39.    Nevertheless, despite the obvious problems associated with Officer Robbert's investigation and report, Defendant/Supervising Officer Sergeant Nikki Prasad unquestioningly approved it, thereby proximately and directly causing the prosecution of Mr. Dryden to go forward, and giving rise to an inference that Prasad was either willfully indifferent to Mr. Dryden's rights and/or the veracity of Robbert's report, or through silence and inaction, deliberately seeking to aide in the advancement of Officer Robbert's scheme.

40.    Sergeant Prasad's approval of Defendant Officer Robbert's fabricated arrest report was made all the more troubling when just three months after Mr. Dryden's arrest, a July 2010 New York Times exposé (a true and correct copy of which is attached hereto as **Exhibit A**) revealed that between 2006 and 2010, residents of Brownsville, Brooklyn were subjected to a dramatically disproportionate amount of police stops compared with residents of other areas of New York City, in part because officers at the 73rd Precinct were under significant pressure to carry out a Departmental policy mandating officers to achieve certain "floor numbers" (i.e., quotas) of stops and/or arrests.

41.    Mr. Dryden was incarcerated for approximately 24 hours before being released on bail, and his prosecution continued for some 9 months, requiring multiple court appearances, missed work and loss of income, as well as extra childcare costs, legal fees, and the endurance of significant amounts of humiliation, anxiety, and emotional distress.

42.    Thankfully, the unjust prosecution of Mr. Dryden was brought to an end on December 1, 2010, when Judge Gilbert Hong dismissed all charges against Mr. Dryden after the Assistant District Attorney reported, on record, that the Defendant Officers had, in fact, perpetrated an illegal search on the Drydens' home.

43.    There is no evidence that any of the Defendant Officers was ever disciplined for their flagrant violations of Mr. and Mrs. Drydens' rights.

## AS AND FOR THE FIRST CAUSE OF ACTION
## ON BEHALF OF PLAINTIFFS AGAINST
## DEFENDANTS ROBBERT, DOE, PRASAD AND THE CITY OF NEW YORK

### Violation of Constitutional Rights Under Color of State Law
### —Warrantless Entry Into and Search of Home—

44.     Plaintiffs incorporate by reference and reallege each and every allegation stated in
Paragraphs 1 through 43.

45.     The Fourth Amendment of the United States Constitution protects citizens from
unreasonable searches and seizures by government officials.  Specifically, the Fourth
Amendment precludes police officers from entering and searching someone's home
in the absence of appropriate process—e.g., a warrant—or special circumstances.

46.     Defendant Officers Robbert and Does' search of Christopher and Sumintra
Dryden's home, in the absence of a warrant or other exigent circumstances, was
clearly improper and represents a violation of the Drydens' rights under the Fourth
Amendment of the United States Constitution.

47.     This conduct on the part of Defendants also represents a violation of 42 U.S.C. §
1983, given that said actions were undertaken under color of state law.

48.     Defendants' actions were motivated by bad faith and malice.

49.     As a direct and proximate result of the unconstitutional acts described above,
Plaintiffs Christopher and Sumintra Dryden have been irreparably injured.

## AS AND FOR THE SECOND CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF CHRISTOPHER DRYDEN AGAINST
## DEFENDANTS ROBBERT, DOE, PRASAD AND THE CITY OF NEW YORK

### Violation of Constitutional Rights Under Color of State Law
### —False Arrest and Imprisonment—

50.     Plaintiffs incorporate by reference and reallege each and every allegation stated in
Paragraphs 1 through 43.

7

51.     The Fourth Amendment of the United States Constitution protects citizens from unreasonable searches and seizures by government officials, and prohibits law enforcement officers from arresting and detaining individuals in the absence of appropriate authorization. The Fourth Amendment also precludes police officers from conducting arrests in the absence of probable cause to believe that a crime has been committed.

52.     The actions of Defendant Officers Robbert and Doe detailed above violated Christopher Dryden's rights under the Untited States Constitution. Given the total absence of any legal justification for Defendants Robbert and Doe to enter the Drydens' home and conduct a search in the first place, it was not objectively reasonable for Robbert and/or Doe to arrest Christopher Dryden for anything on April 18, 2010. Moreover, Defendant Officers Robert and Doe had no foreknowledge or reason to believe that any contraband discovered was specifically attributable to Christopher Dryden, as opposed to any other resident of the premises.

53.     Defendants' actions were motivated by bad faith and malice.

54.     This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

55.     As a direct and proximate result of the unconstitutional acts described above, Plaintiff Christopher Dryden has been irreparably injured.

## AS AND FOR THE THIRD CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF CHRISTOPHER DRYDEN AGAINST
## DEFENDANTS ROBBERT, DOE, PRASAD AND THE CITY OF NEW YORK

### Violation of Constitutional Rights Under Color of State Law
### —Malicious Prosecution—

56.     Plaintiffs incorporate by reference and reallege each and every allegation stated in Paragraphs 1 through 43.

57.     The Fourth Amendment of the United States Constitution protects citizens from overzealous and malicious prosecution by government officials without probable cause.

8

58.    Christopher Dryden was prosecuted, without probable cause, relative to two misdemeanor offenses and a violation for the events that took place at his home April 18, 2010.

59.    The charges listed above resulted in a loss of liberty for Cristopher Dryden, as he was incarcerated for approximately 24 hours as a result of these false and improper charges, and was forced to fight said charges for some nine months after, incurring substantial financial and emotional costs as a direct result.

60.    Mr. Dryden's criminal proceeding was terminated in favor of Mr. Dryden, as the charges in question were dismissed outright.

61.    Defendants' actions were motivated by bad faith, malice, and/or deliberate indifference to the rights of Christopher Dryden.

62.    This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

63.    As a direct and proximate result of the unconstitutional acts described above, Plaintiff Christopher Dryden has been irreparably injured.


### AS AND FOR THE FOURTH CAUSE OF ACTION
### ON BEHALF OF PLAINTIFFS AGAINST DEFENDANTS ROBBERT, DOE, PRASAD AND THE CITY OF NEW YORK

#### Violation of Constitutional Rights Under Color of State Law
#### —Conspiracy to Violate Plaintiffs' Civil Rights—

64.    Plaintiffs incorporate by reference and reallege each and every allegation stated in Paragraphs 1 through 43.

65.    Defendant Officers Robbert, Doe, and Prasad, acting under color of state law in both their individual capacities and as agents for the City of New York, conspired together, reached a mutual understanding, and acted in concert to undertake a course of conduct violative of Plaintiffs' civil rights by:

   a.    Agreeing to intentionally fabricate a legal justification for the warrantless entry and search of the Plaintiffs' home.

9

b. Agreeing to falsely arrest and imprison Christopher Dryden, as aforedescribed.

c. Agreeing to contrive false charges against Christopher Dryden, as reflected in Defendant Officer Robbert's arrest report, and to cause him to be maliciously prosecuted as aforedescribed.

66.    This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

67.    Defendants' actions were motivated by bad faith, malice, and/or willful indifference.

68.    As a direct and proximate result of the unconstitutional acts described above, Plaintiffs Christopher and Sumintra Dryden have been irreparably injured.

### AS AND FOR THE FIFTH CAUSE OF ACTION
### ON BEHALF OF PLAINTIFFS AGAINST DEFENDANTS
### NIKKI PRASAD AND THE CITY OF NEW YORK

**Implementation of Municipal Policies, Practices, and Customs that Directly Violate Constitutional Rights, Failure to Implement Municipal Policies to Avoid Constitutional Deprivations and Failure to Train and Supervise Employees Under Color of State Law**

69.    Plaintiffs incorporate by reference and reallege each and every allegation stated in Paragraphs 1 through 43.

70.    Upon information and belief, Defendant Supervising Officer Sergeant Nikki Prasad was directly responsible for supervising Defendant Officers Robbert and Doe.

71.    Upon information and belief, Defendant City of New York and Sergeant Prasad who were supervisors and final decision makers, as a matter of policy, practice, and custom, have acted with a callous, reckless and deliberate indifference to the Plaintiffs' constitutional rights and laws of the United States, in that they failed to adequately discipline, train, supervise or otherwise direct police officers concerning the rights of citizens, including not making warrantless searches of people's home absent exigent circumstances, and not making arrests without probable cause to believe a crime has been committed.

10

72.    In the alternative, and upon information and belief, Defendants City of New York and Prasad instituted policies addressing the topics listed above, but then through gross negligence, carelessness, malice, and/or improperly pressuring officers to meet certain arrest quotas regardless of whether probable cause was present, demonstrated a deliberate indifference to the constitutional rights of citizens residing in Brownsville, Brooklyn, New York.

73.    Defendant Prasad, upon information and belief, has also demonstrated deliberate indifference to the rights of those arrested in the City of New York by failing to adequately hire, screen, train, and supervise officers at the 73rd Precinct.

74.    The policies, procedures, customs and practices of the above-named Defendants violated the Constitutional rights of the Plaintiffs under the Fourth Amendment of the United States Constitution.

75.    This conduct on the part of Defendants Nikki Prasad and the City of New York also represents a violation of 42 U.S.C § 1983, given that said actions were undertaken under color of state law.

76.    As a direct and proximate result of the unconstitutional acts described above, the Plaintiffs have been irreparably injured.

## DEMAND FOR PUNITIVE DAMAGES

77.    The actions of Defendants described herein were extreme and outrageous, and shock the conscious of a reasonable person. Consequently, an award of punitive damages is appropriate to punish the Defendants for their cruel and uncivilized conduct. The Plaintiffs do not seek punitive damages against the City of New York.

## DEMAND FOR TRIAL BY JURY

78.    The Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs Christopher and Sumintra Dryden request that this Honorable Court grant them the following relief:

A. A judgment against Defendants Robbert and Doe for compensatory damages, punitive and punitive damages in an amount to be determined by a properly charged jury;

B. A judgment in favor of Plaintiffs against Defendant Sergeant Nikki Prasad for compensatory and punitive damages in an amount to be determined by a properly charged jury.

C. A judgment in favor of Plaintiffs against Defendant City of New York for compensatory damages in an amount to be determined by a properly charged jury;

D. A monetary award for attorneys fees and costs of this action, pursuant to 42 U.S.C. § 1988;

E. Any other relief this Court finds to be just, proper, and equitable.

Dated:  New York, New York
       February 22, 2011

Respectfully Submitted By:

_____
Jeffrey Chabrowe, Esq.
EDNY Bar Code Number: JC3848
Law Office of Jeffrey Chabrowe
261 Madison Avenue, 12 Floor
New York, New York 10016
T:    (917) 529-3921
F:    (212) 736-3910
E: jchabrowe@gmail.com

**The New York Times** Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to
your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit
www.nytreprints.com for samples and additional information. Order a reprint of this article now.



July 11, 2010

# A Few Blocks, 4 Years, 52,000 Police Stops

**By RAY RIVERA, AL BAKER and JANET ROBERTS**

When night falls, police officers blanket some eight odd blocks of Brownsville, Brooklyn.
Squad cars with flashing lights cruise along the main avenues: Livonia to Powell to Sutter to
Rockaway. And again.

On the inner streets, dozens of officers, many fresh out of the police academy, walk in pairs
or linger on corners. Others, deeper within the urban grid, navigate a maze of public housing
complexes, patrolling the stairwells and hallways.

This small army of officers, night after night, spends much of its energy pursuing the
controversial Police Department tactic known as "Stop, Question, Frisk," and it does so at a
rate unmatched anywhere else in the city.

The officers stop people they think might be carrying guns; they stop and question people
who merely enter the public housing project buildings without a key; they ask for
identification from, and run warrant checks on, young people halted for riding bicycles on
the sidewalk.

One night, 20 officers surrounded a man outside the Brownsville Houses after he would not
let an officer smell the contents of his orange juice container.

Between January 2006 and March 2010, the police made nearly 52,000 stops on these
blocks and in these buildings, according to a New York Times analysis of data provided by
the Police Department and two organizations, the Center for Constitutional Rights and the
New York Civil Liberties Union. In each of those encounters, officers logged the names of
those stopped — whether they were arrested or not — into a police database that the police
say is valuable in helping solve future crimes.

These encounters amounted to nearly one stop a year for every one of the 14,000 residents of these blocks. In some instances, people were stopped because the police said they fit the description of a suspect. But the data show that fewer than 9 percent of stops were made based on "fit description." Far more — nearly 26,000 times — the police listed either "furtive movement," a catch-all category that critics say can mean anything, or "other" as the only reason for the stop. Many of the stops, the data show, were driven by the police's ability to enforce seemingly minor violations of rules governing who can come and go in the city's public housing.

The encounters — most urgently meant to get guns off the streets — yield few arrests. Across the city, 6 percent of stops result in arrests. In these roughly eight square blocks of Brownsville, the arrest rate is less than 1 percent. The 13,200 stops the police made in this neighborhood last year resulted in arrests of 109 people. In the more than 50,000 stops since 2006, the police recovered 25 guns.

Greg Jackson, 58, a former professional basketball player who runs the Brownsville Recreation Center, said the rising tide of stops had left many who wanted a strong police presence here feeling conflicted.

"Do we welcome the police?" he said, "Of course I do. Ninety-nine percent of the people in the area do. But they also fear the police because you can get stopped at any time."

New York is among several major cities across the country that rely heavily on the stop-and-frisk tactic, but few cities, according to law enforcement experts, employ it with such intensity. In 2002, the police citywide documented 97,000 of these stops; last year, the department registered a record: 580,000.

There are, to be sure, plenty of reasons for the police to be out in force in this section of Brooklyn, and plenty of reasons for residents to want them there. Murders, shootings and drug dealing have historically made this one of the worst crime corridors in the city.

But now, in an era of lower crime rates, both in this part of Brooklyn and across the city, questions are swirling over what is emerging as a central tool in the crime fight, one intended to give officers the power to engage anyone they reasonably suspect has committed a crime or is about to.

The practice has come under intense scrutiny. Lawmakers are monitoring the situation. Civil libertarians are challenging it. The Police Department is studying it. And police officials, from Commissioner Raymond W. Kelly to local precinct commanders, are defending it.

"I don't know what too many stops are," said Deputy Inspector Juanita Holmes, who until recently was in charge of the department's officers specifically assigned to protect the housing projects that largely make up these blocks of Brownsville. "The stops conducted by us are to address the crime, or the quality-of-life issues."

## A Troubled Neighborhood

In a dank stairwell inside 340 Dumont Avenue, a dim light flickers and the stench of urine fills the air. It was here in 1988 in the Samuel J. Tilden Houses that Officer Anthony O. McLean took a bullet to the chest. He had been searching for a missing 10-year-old girl when he stumbled into a drug deal.

Crime here — a rectangle of housing developments and faded commercial strips — is hardly what it was in those bloody days. But the labyrinth of stairwells, hallways, courtyards, lobbies and roofs of the complexes — 65 buildings ranging from 6-story apartment buildings to 20-story towers — still presents a dangerous challenge for police.

Lobby mailboxes are used for drug transactions. Locks and intercoms meant to allow in only residents and their visitors are routinely broken. Officers say they often find bullet casings on the roofs, where people take target practice or fire in the air in celebration.

In November 2008, a man delivering meals for charity was shot dead in a lobby of the Brownsville Houses after delivering food to two elderly women. Five months later, a 43-year-old woman was stabbed to death trying to break up a fight outside her apartment in the Tilden Houses.

"It's tough," said Deputy Inspector Holmes, who took over command of these housing projects in 2008. "A lot of our kids in the area carry guns. Whether they carry them for protection, 'because I'm trying to get to school without being victimized,' or they carry them 'because I'm going to rob somebody today,' there are a lot of guns out there. And it creates a challenge."

In 2007, the year before she took command, shootings in the five developments had reached a five-year high. During her first six months on the job, her officers increased stops by 23 percent from the previous six months, the data show. The next year, her officers made more than 10,000 stops.

Deputy Inspector Holmes said she studied the number of stop-and-frisks in her area closely, and credited them with making the houses safer for law-abiding residents. She said over the

Case 1:11-cv-00862-NGG-RLM   Document 1   Filed 02/22/11   Page 16 of 21 PageID #: 16

first six months of this year violent crime was down in almost every category in the five complexes.

But that same success has not been seen outside the developments. Shootings are up 39 percent in the 73rd Precinct this year. In 2008 the precinct, which includes these blocks of public housing, led the city in murders, and it consistently has one of the city's highest rates of violent crime.

Still, Deputy Inspector Samuel Wright, who took over command of the precinct in January 2009, says stop-and-frisks have "had a significant impact" on crime reduction.

"In 2008 there were a lot of murders in the 73rd Precinct," he said. "We were able to reduce homicides by 32 percent in 2009, and I think that was attributed to the stop, question and frisk policy. We had a reduction in robberies. We had a reduction in grand larcenies."

Law enforcement experts say that it is very hard, perhaps even impossible, to draw direct connections between the stop-and-frisk tactic and significant long-term crime reduction.

Certainly, some say that the New York Police Department has so far failed to convincingly link the explosion in the numbers of stops with crime suppression.

And some, from academics to the residents of these streets in Brooklyn, believe the stops could have a corrosive effect, alienating young and old alike in a community that has long had a tenuous relationship with the police.

"This is an important issue, right now, that the N.Y.P.D. must get out in front of as soon as they can," said Richard Rosenfeld, a professor of criminology and criminal justice at the University of Missouri, St. Louis. "And the best way they can do that is to provide credible evidence that the stop-and-frisk campaign actually is responsible for the crime reductions the city has enjoyed."

Without that evidence, he said, the stop-and-frisks that do not result in arrests could "reduce the perceived legitimacy of the police in the eyes of the public."

One researcher who has studied the impact of stop-and-frisk on crime insists it is effective. In a 2008 study presented to the City Council, Dennis C. Smith, a professor at the Robert F. Wagner Graduate School of Public Service at New York University, wrote that the strategy was effective across the city for robbery, murder, burglary and auto theft. But it found no citywide impact on assault, rape or grand larceny. The study also suggested the tool's success varies over time and often loses effectiveness as the volume of stops increases.

"One important implication is that effective crime fighting requires continuous innovation," wrote Professor Smith, who is an expert witness for the Police Department in a lawsuit brought by the Center for Constitutional Rights over allegations of racial profiling in stop-and-frisk. "Another is the interventions are blunt instruments that need to be used with care."

## Calls for Sensitivity

To many residents here, care is exactly what is not being used. To them, the flood of young officers who roam the community each day are not equipped to make the subtle judgments required to tell one young man in low-hanging jeans concealing a weapon from another young man wearing similar clothes on his way to school.

The United States Supreme Court established the legal basis for stops and frisks — reasonable belief that a person is armed and dangerous — in the 1968 case of Terry v. Ohio. But the officer in that case had a far different level of experience than many of the officers walking the streets of Brownsville. He had patrolled the same streets of downtown Cleveland for 30 years looking for pickpockets and shoplifters.

By comparison, the nearly 200 officers who operate in the neighborhood as part of Mr. Kelly's "Impact Zone" program — flooding problematic crime pockets with a battery of police — are largely on their first assignment out of the academy.

The data show the initiative is conducted aggressively, sometimes in what can seem like a frenzy. During one month — January 2007 — the police executed an average of 61 stops a day.

The high number of stops in this part of Brooklyn can be explained in part by the fact that police can use violations of city Housing Authority rules to justify stops. For instance, the Housing Authority, which oversees public housing developments, forbids people from being in their buildings unless they live there or are visiting someone.

And so on a single Friday in January 2009, the police stopped 109 people in this area, 55 of them inside the project buildings, almost half for suspicion of trespassing. The show of force resulted in two arrests for misdemeanor possession of marijuana and misdemeanor possession of a weapon.

Inside the project buildings and out, males 15 to 34 years of age, who make up about 11 percent of the area's population, accounted for 68 percent of the stops over the years. That amounted to about five stops a year each, though it was impossible to tell how often

Case 1:11-cv-00882-NGG-RLM   Document 1   Filed 02/22/11   Page 18 of 21 PageID #: 18

someone was stopped or if that person lived in the neighborhood, because the data did not include the names or addresses of those stopped. Police officials say the age figures sound right, since most crime suspects fit that description.

Young black men get stopped so often that a few years ago, Gus Cyrus, coach of the football team at nearby Thomas Jefferson High School, started letting his players leave practice with their bright orange helmets so the police would not confuse them with gang members.

"My players were always calling me saying 'Coach, the police have me,' " Mr. Cyrus said.

At an entrance to 305 Livonia Avenue, a 16-story building in Tilden Houses, the door lock has been broken for weeks. It is the same at 360 Dumont Avenue, negating anyone's need for a key to get inside. At 363 Dumont Avenue, in the Brownsville Houses, another metal lock is broken to another door.

Young men cluster around the doorways on hot summer evenings. Mothers sit on benches outside them as they guard children in the courtyard playgrounds.

And officers are watching. If someone enters without a key, it is reason to stop them, check for identification and, if necessary, take out handcuffs.

Many residents say they philosophically embrace the police presence. They say they know too well how the violence around them — the drugs and gangs — can swallow up young people.

Yet the day-to-day interactions with officers can seem so arbitrary that many residents say they often come away from encounters with officers feeling violated, degraded and resentful.

Almost everyone in the projects has a story. There is Jonathan Guity, a 26-year-old legal assistant with no criminal record, who, when asked how many times he had been stopped in the neighborhood where he grew up, said, "Honestly, I'd say 30 to 40 times. I'm serious."

The most recent stop, he said, was about three months ago after he had dropped his girlfriend off at the subway. As he walked home listening to his iPod, he noticed a dark blue Chevrolet following him. Suddenly, the car pulled up on the sidewalk, and two men jumped out. One put his hand on Mr. Guity's pants pocket, he said.

"I slapped his hand away and I'm like, 'What are you doing?' " Mr. Guity said. "He was like, 'Oh,' and he pulled out his badge, so he was like, it was like, 'There was a shooting around here five minutes ago and you fit the description.' "

Oddly, years ago when crime was higher, relations with the police seemed better, several residents said. The officers seemed to show a greater sense of who was law abiding and who was not, they said. Now, many residents say, the newer crop of officers seem to be more interested in small offenses than engaging with residents.

"Rookies," said Sandra Carter, 60, as she sat on a bench outside 372 Blake Avenue.

Several residents painted a portrait of officers moving in only to enforce rules that seemed to always be changing. Once, officers suddenly began telling people they could not congregate around the metal hand rails surrounding an entrance to the building, residents said.

At the local recreation center in Brownsville, Darryl Glenn, 49, stood in the gym with his son, Darryl Jr., and spoke of the need for officers to be there — but also of the equal need for them to improve their performance.

"If anything, there needs to be more police around," said the teenager, who is headed to college. But, he said, the officers could better handle some stop situations, particularly by working to get better descriptions of suspects and by communicating more effectively the reason for the stop.

"When they give a description, it's, 'Young black man, black pants, blue shirt, black hat,' " he said. 'That's mostly everybody. A better description would be better, so they can know who they're looking for, rather than just everyone walking around."

## High Number of Stops

The Times, for this article, interviewed 12 current or former officers who had worked in this part of Brooklyn in the last five years, and all defended the necessity of the stop-and-frisks.

But some former officers who worked the area say the stops seem less geared to bringing down crime than feeding the department's appetite for numbers — a charge police officials steadfastly deny. Though none said they were ever given quotas to hit, all but two said that certain performance measures were implicitly expected in their monthly activity reports. Lots of stop-and-frisk reports suggested a vigilant officer.

"When I was there the floor number was 10 a month," one officer said. Like many of the officers interviewed for this article, he asked not to be identified because he was still in law enforcement and worried that being seen as critical of the New York department could hurt his future employment opportunities.

Case 1:11-cv-00862-NGG-RLM   Document 1   Filed 02/22/11   Page 20 of 21 PageID #: 20

He said if you produced 10 stops — known as a UF-250 for the standardized departmental reports the stops generate — you were not likely to draw the attention of a supervisor. "And in all fairness," he said, "if you're working in that area, 10 a month is very low. All you have to do is open your eyes."

Another former officer who worked in the 73rd Precinct said the pressure was felt more overtly to get an arrest or a criminal summons, but in lieu of those, extra 250s would compensate.

"A lot of us didn't want to bang everyone," the officer said. "These people have a hard enough time in the situation they're living in without making it worse by hitting them with a summons, having them travel to Manhattan for criminal court, and the bosses would get upset and say, 'Well, give us some UF-250s.' It's an easy number."

While each 250 is required to be approved and signed by a supervisor, one former housing officer said getting them was easy: "Just go to the well."

The well, said this officer, is the lobby of any of the many housing buildings. Ryan Sheridan, one of the former officers who said he had never heard supervisors emphasize numbers, nonetheless acknowledged that the lobby and hallways were a legitimate source of 250s.

"Once they walk into the building, every UF-250 can come from a do-not-enter, meaning entering without a key," he said. "But once you ask them for an ID, 90 percent of the people live in the building. That's why the arrest rate is so low. They're not acting suspiciously, but like I said, they don't have a key to enter."

Deputy Inspector Holmes said she never emphasized numbers and scoffed at the notion that her officers were using broken locks to initiate 250s.

"I think that was bad information," she said.

One recent evening, the police stopped a 19-year-old man for spitting on the sidewalk, a health code violation, and entering Langston Hughes Apartments without using a key or being buzzed in, even though the doors were unlocked. "I've lived here for 19 years," the young man, who lived in a neighboring building, protested. "You see me coming into these buildings every day, and now you're going to stop me."

The reaction was natural. "People don't enjoy being stopped going to and from where they're going," one of the officers, Robert McNamara, said later. But the officers also had another rationale, he said. They had spotted the same man near the scene of a dropped gun some days earlier, and hoped to use the stop to check for outstanding warrants. None found, they

Case 1:11-cv-00862-RGG-REM   Document 1   Filed 02/22/11   Page 21 of 21 PageID #: 21

let him go without citing him, using the kind of discretion necessary in these situations, Officer McNamara said.

Stop-and-frisk is a "valuable tool," he said, "but there needs to be some common sense when using the tool."

*This article has been revised to reflect the following correction:*

## Correction: July 28, 2010

*An article on July 12 about the New York Police Department's tactic known as "Stop, Question, Frisk" and its application in eight blocks of Brownsville, Brooklyn, referred imprecisely to the legal standard that governs when police officers are permitted to frisk someone. The United States Supreme Court has held that in order for the police to frisk someone they must have a reasonable belief that the person is armed and dangerous. The standard cited in the article — reasonable suspicion of a crime — is enough to justify a stop, but not enough to make a legal frisk.*